# In the United States Court of Federal Claims

No. 10-339C

(Filed:  October 4, 2010)

Reissued:  October 20, 2010[1]

_____

| | |
|---|---|
| CRASSOCIATES, INC., | * Post-award bid protest; Cross-motions for |
| | * judgment on the administrative record; |
| Plaintiff, | * Standard of review; 48 C.F.R. § 52.222-46 |
| | * – failure to comply with professional |
| v. | * services clause; Probative weight to be |
| | * given contracting officer's statement before |
| THE UNITED STATES, | * the GAO; Price realism analysis; Technical |
| | * evaluation; Inclusion of price information in |
| Defendant, | * the technical proposals; Staffing plan factor |
| | * – failure to provide adequate explanation |
| and | * for weakness and adjectival rating; Facility |
| | * layout factor – unequal treatment of |
| SPECTRUM HEALTHCARE | * offerors; Responsibility determination – |
| RESOURCES, INC., | * reliance on "current" information; |
| | * Organizational conflict of interest; |
| Defendant-Intervenor. | * Prejudice; Injunctive factors analyzed; |
| | * Injunction warranted. |

_____

## OPINION

_____

*Kenneth Bernard Weckstein,* Brown Rudnick Berlack Israels, LLP, Washington, D.C., for plaintiff.

*Jeffrey Andrew Regner,* Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Amy Laderberg O'Sullivan*, Crowell & Moring, LLP, Washington, D.C., for defendant-Intervenor.

_____

[1] An unredacted version of this opinion was issued under seal on October 4, 2010.  The opinion issued today incorporates the majority of the parties' proposed redactions and corrects some minor nonsubstantive or typographical errors.  The redacted material is represented by brackets [ ].

**ALLEGRA Judge:**

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record.  Plaintiff, CRAssociates, Inc. (CRA), challenges the U.S. Army's award of a contract to Spectrum HealthCare Resources (Spectrum) to provide community health care services to military personnel and their dependents in the National Capital Area (NCA).  For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, plaintiff's motion for judgment on the administrative record and **DENIES**, in part, and **GRANTS**, in part, defendant's and defendant-intervenor's cross-motions.  An appropriate injunction will issue.

## I.      BACKGROUND

The administrative record in this case reveals the following:

Plaintiff is currently furnishing health care services to military beneficiaries out of two Family Health Centers (FHCs) in Fairfax and Woodbridge, Virginia.  These community-based FHCs provide family-centered primary care and some specialty care for a major segment of the NCA military population and their family members.  As of March of this year, these facilities had over 47,000 beneficiaries, generating 17,000 clinic visits per month and 49,000 pharmacy prescriptions per month.  These clinics also provide a significant number of inpatient referrals to Walter Reed Army Medical Center and the National Navy Medical Center.

On April 16, 2009, the Army issued Request for Proposals (RFP) No. W81K04-09-R-0002, seeking a contractor to provide community-based primary and specialty health care services to eligible military beneficiaries.  The RFP contemplated the award of a fixed-price contract, with cost reimbursement line items, for a six-month transition period, a one-year base period, and four one-year option periods.  In responding to the solicitation, offerors were directed to submit an administrative proposal, a technical proposal, past/present performance information, a price proposal and a subcontracting plan.  Regarding these documents, the RFP advised that "[a]ll documents submitted in response to this RFP must be fully responsive to and consistent with the requirements of the RFP."[2]  The RFP provided that the award of the contract would be on a negotiated, "best value" basis.

---

[2]  Regarding the content of documents, the RFP added –

The Government intends to make award without holding discussions with offerors.  However, the Contracting Officer reserves the right to hold discussions if deemed necessary.  Therefore, offerors are encouraged to include their best terms and conditions (both price and technical) in the initial offer.

A.      **The RFP**

1.      **Proposal Requirements**

The RFP required the contractor to provide all necessary facilities, maintenance, staffing, supplies and equipment for the two FHCs, known as FHC-North and FHC-South.  The RFP listed the contract's required services and supplies in the form of contract line items (CLINs). The first two CLINs corresponded to the two FHCs, which were to be built during the six-month transition period.  Other CLINs focused on primary and specialized health care services, including primary care and optometry clinics, a medical laboratory, physical therapy, a pharmacy, and numerous other specialized care services to be provided during the contract base period and all four option periods.  The CLINs specified that the contractor would be responsible for providing all building leases, maintenance, and administrative support.

The RFP's Performance Work Statement (PWS) detailed the scope of services and specific requirements within each type of service.  Regarding the two FHCs, the PWS stated "[e]ach clinic shall be designed to meet the scope of services outlined in the PWS, to maximize staff productivity and efficiency and, at a minimum, to support the current level of service represented in the existing clinics."  It added that the contractor must provide "improved access [to] primary care appointing," which would guarantee patients same-day acute-care appointments under certain conditions.  Regarding the health care concept embodied in its requirements, the PWS advised that "[t]his healthcare concept includes improved access to primary care appointing, individual provider and provider team empanelment with an emphasis on patient outcomes, continuity of care, and quality care as defined in the Joint Commission and TRICARE standards, and overall patient satisfaction."

The RFP laid out requirements for "Contractor Furnished Equipment," including the contractor-provided FHCs.  Each FHC was required to be "no further than a 30 minute drive" from DeWitt Army Community Hospital.  Facility location was also to take into account the location of other Department of Defense military treatment facilities and, in particular, "not encroach on other DOD clinics' population."  In addition, facilities were required to "meet all state, county and federal laws/regulations governing construction, occupation, accessability, and maintenance of community health care facilities of this general nature and scope."

Technical proposals were to address various factors and subfactors relating to personnel; management plan; facility location and layout; staffing model; transition plan; quality control plan; and subcontracting opportunities.  For factor 3, facility location and layout, the RFP instructed offerors to "[d]escribe the proposed clinic locations and layouts at each facility," including "site locations, traffic patterns, parking, entrances, energy savings objectives, etc."  For factor 5, transition plan, the RFP apprised offerors as follows:

Provide a detailed transition plan on how you plan to prepare for full performance under the contract.  Include a detailed milestone chart depicting recruitment, facility acquisition and facility preparation, training, transfer of [Government

Furnished Equipment], patient notification, credentialing and all other actions
needed to prepare for full performance.  Discuss all resources and schedules.

For the past and present performance proposal, contractors were required to provide information
regarding "all relevant contracts and subcontracts started or completed within the past three
years" for the contractor and all subcontractors performing major or critical aspects of the work.
The pricing proposal was required to contain "a unit price for each of the CLINs/subCLINs" and
"a detailed cost element breakout for each of the line items."  It was also to "include a narrative
detailing the basis of the labor rates, facility costs and each cost element making up the total
price," as well as a "comprehensive breakout of proposed staffing by category showing hours and
labor rates."

### B.    Evaluation Criteria

The RFP directed the Contracting Officer (CO) to use a "Technical-Cost Trade-off
process to determine which offer has the overall best value to the Government."  The RFP
indicated that the following factors and significant subfactors would be considered in making that
best value determination:

| Factors | Subfactors |
|---|---|
| 1.  Personnel | a.  Recruitment<br>b.  Retention/Employee Relations<br>c.  Compensation Plan |
| 2.  Management Plan | a.  Demand Management/Access to Care<br>b.  Education Programs<br>c.  Program Objectives |
| 3.  Facility Location & Layout | |
| 4.  Staffing Model | |
| 5.  Transition Plan | |
| 6.  Quality Control Plan | |
| 7.  Subcontracting Opportunities | |
| 8.  Past & Present Performance | |
| 9.  Price Proposal. | |

In addition, for large businesses, the CO was to consider the offeror's subcontracting plan.
Regarding the relative importance of these factors and subfactors, the RFP stated:

Factors 1, 2, 3, and 4 are of equal importance and when combined are
significantly more important than Factors 5, 6, and 7 combined.  Factor 5 is

significantly less important than Factors 6 and 7, which are approximately equal.
Factor 1, subfactors a, b, and c are of equal importance.  Factor 2, subfactors a, b,
and c are of equal importance.  Factors 1 through 7, when combined are
significantly more important than Factor 8.  Non-price Factors 1 through 8, when
combined, are significantly more important than Factor 9 Price.

The subcontracting plan was not to be rated as part of the technical proposal, but rather to be
rated by the CO in his overall evaluation, and then approved by the Small Business
Administration.

Each offeror's technical approach (factors 1 through 7)  was to be evaluated for
"strengths, deficiencies, significant weaknesses and risks" and given one of five possible
adjectival ratings: "excellent" (no weaknesses or deficiencies), "good" (one or more strength, no
deficiencies, and minimally disruptive weaknesses), "satisfactory" (no strengths, no deficiencies,
and no material weaknesses), "marginal" (minor omissions, and weaknesses or minor
deficiencies), or "unsatisfactory" ("fails to demonstrate a basic understanding of the requirement
. . . [and] has major omissions, weaknesses, or deficiencies").  Past and present performance
(factor 8) was to be assessed to determine the "risks associated with each offeror's likelihood of
success in performing the requirements stated in the RFP based on that offeror's demonstrated
performance on recent, relevant contracts," and then rated accordingly.  The offeror was to
receive a rating of "excellent" for very low risk, "good" for low risk, "adequate" for moderate
risk, "marginal" for high risk, "poor" for very high risk, and "unknown" if the offeror had
"little/no relevant past performance upon which to base a meaningful performance risk
prediction."  The RFP stated that the CO could "consider favorable or unfavorable past
performance as a tiebreaker when comparing offerors who have no past performance history with
offerors who do have past performance history."  For example, if all other factors were relatively
equal, "an offeror with a favorable past performance history may be selected over an offeror with
no past performance history."  Past performance evaluation was to consider predecessor
companies, key personnel, and "subcontractors that will perform major or critical aspects of the
work."

The price proposal was "not rated," although it was to be reviewed for "reasonableness
and realism."  Regarding the latter analysis, the RFP prescribed –

Realism will pay particular attention to the facility costs, direct labor rates and
fringe benefits.  Comparison to the [Independent Government Estimate] and
analysis of the offeror's price proposal breakout and rational [sic] will be
reviewed for excessive cost risk.  Proposals found to have high cost risk will not
be considered for award.

In addition, the RFP incorporated the clause found at FAR § 52.222-46, Evaluation of
Compensation for Professional Employees, which required the Army to evaluate professional
compensation to ensure that it was not "unrealistically low or not in a reasonable relationship to

the various job categories," so as to "impair the Contractor's ability to attract and retain competent professional employees."

### C.    Proposals and the Evaluation Process

The Army received two proposals, one from Spectrum and the other from CRA.  The Source Selection Evaluation Board (SSEB) met from June 15 to 26, 2009 to evaluate the technical portions of these proposals.  The SSEB issued first discussion letters on July 8 and 9, 2009, and then had face-to-face meetings with the offerors on July 14 and 15, 2009, to clarify various matters.  The offerors were instructed to review all aspects of their proposals and provide any revisions no later than August 14, 2009.  Both offerors submitted revised proposals on August 14, 2009.  After the SSEB conducted a second round of evaluations from August 16 through 21, 2009, the Army issued second discussion letters on August 21, 2009.  Offerors were instructed to review again all aspects of their proposals and provide final proposal revisions to include revised technical, pricing and subcontracting plan proposals no later than September 4, 2009.  Both offerors submitted final proposal revisions by September 4, 2009.  On September 8 and 9, 2009, the SSEB met to review information bearing on the factors that had previously received less than "satisfactory" ratings.

On September 10, 2009, the SSEB briefed the CO and the Source Selection Authority (SSA).  The latter approved reopening discussions and issuing third discussion letters to address the factors and subfactors still rated as "marginal."  Offerors were instructed to provide revised technical proposals addressing shortcomings identified in the discussion letters by September 21, 2009.  Offerors submitted final revised proposals and the CO was briefed on September 21, 2009.  Following evaluation of these proposals the final adjectival ratings for the major factors, and proposed prices were as follows:

| Factors | Spectrum | CRAssociates |
|---|---|---|
| 1.  Personnel | Good | Good |
| 2.  Management Plan | Satisfactory | Marginal |
| 3.  Facility Location & Layout | Good | Satisfactory |
| 4.  Staffing Model | Satisfactory | Marginal |
| 5.  Transition Plan | Satisfactory | Satisfactory |
| 6.  Quality Control Plan | Satisfactory | Good |
| 7.  Subcontracting Opportunities | Satisfactory | Satisfactory |
| 8.  Past and Present Performance | Adequate | Excellent |
| Price | [ ] | [ ] |

Spectrum received ratings superior to CRA on three of the first four most heavily-weighted factors – Facility Location & Layout, Management Plan and Staffing Model.  Based upon this information, the CO determined that Spectrum's proposal offered the best value to the Army.

The Army awarded the contract to Spectrum on September 23, 2009.  The Army held face-to-face debriefings with both CRA and Spectrum on September 28, 2009.

**D.    GAO Protests**

On October 2, 2009, CRA filed its first protest with the GAO, which was followed by two supplemental protests filed on October 8, 2009, and November 12, 2009.  On November 25, 2009, the Army notified CRA that it planned to take limited corrective action on CRA's second supplemental protest and reevaluate Spectrum's past performance.  As the result of this corrective action, Spectrum's rating for past performance was changed from "adequate" to "unknown" and CRA's management plan rating went from "marginal" to "satisfactory."  On December 13, 2009, because of the Army's corrective action, the GAO dismissed CRA's first three protests as academic.  On December 24, 2009, the Army again awarded the contract to Spectrum.  In describing the basis for this award, the SSA described his rationale as follows –

> The basis of award is in accordance with the evaluation criteria set forth in Section M of the solicitation (Attachment 10), where Technical is more important than Past/Present Performance, and combined are more important than price.  As stated in solicitation, technical Factors 1 through 4 are of equal importance and when combined are significantly more important than technical Factors 5,6 and 7.  As for Factors 1 through 4, Spectrum has two Goods and two Satisfactory ratings compared to CRAssociates which received one Good, two Satisfactory and one Marginal ratings giving Spectrum the advantage.  For Factors 5 through 7, Spectrum has three Satisfactory and CRAssociates one Good and two satisfactory giving CRAssociates an advantage.  As Factors 1 through 4 combined are significantly more important than 5 through 7 combined, and after considering all the relative strengths and weaknesses of the two proposals, Spectrum has the overall technical advantage.  As for Past performance, Spectrum received a rating of Unknown, while CRAssociates received an Excellent giving CRAssociates the advantage for this factor.  As the solicitation states that technical (Factors 1 through 7) are significantly more important than past performance (Factor 8), Spectrum has the overall best proposal before looking at Price.  As Spectrum's price proposal is [] than CRAssociates' price proposal over the life of the contract, Spectrum offers the best overall proposal.  In comparison with the IGE, the Spectrum price proposal is [] percent [] the IGE, while CRAssociates' price proposal is [] percent [] the IGE (see Attachment 13 for more detail).  Spectrum's price proposal was fully assessed and found to be reasonable and realistic.  Spectrum's overall proposal (technical, past/present performance, and price) offers the best value to the Government in accordance with the evaluation criteria

in Section M of the solicitation.  There are no benefits in CRA's proposal that would justify the additional [] above the Spectrum's proposal.

On December 29, 2009, CRA filed a fourth protest with the GAO, challenging, among other things, the CO's finding of responsibility.  On January 22, 2010, the Army notified Spectrum of its intent to take its second corrective action and for the CO to revisit his responsibility determination.  After exchanging information with Spectrum, on February 17, 2010, the CO again determined that Spectrum was responsible and, based on the previous SSA decision, again awarded the contract to Spectrum.  On February 23, 2010, CRA filed its fifth protest with the GAO, followed by two supplemental protests on March 1, 2010, and March 15, 2010.  On June 1, 2010, the GAO denied CRA's remaining protests.

During these protests, CRA continued to provide medical services through a series of bridge contracts.  The Army awarded CRA the first of these contracts on April 1, 2007, for the period from April 1, 2007, through September 30, 2008.  It awarded CRA a second bridge contract for October 1, 2008, through September 30, 2009, with a six-month option period until March 31, 2010, followed by a three-month extension to June 30, 2010.  The Army subsequently awarded CRA another bridge contract effective through October 1, 2010, with the possibility of several six-month options/extensions.

### E.     Procedural History

On June 2, 2010, CRA filed its complaint in this court, together with an application for a temporary restraining order and a motion for a preliminary injunction.  On June 3, 2010, Spectrum filed a motion to intervene as defendant-intervenor, which the court granted that same day.  On June 4, 2010, the court held a status conference at which the parties agreed to move forward with the motion for a preliminary injunction on an accelerated briefing schedule.  At the conclusion of oral argument on June 29, 2010, the court denied plaintiff's motion for preliminary injunction, orally finding that the existence of the bridge contract had, in the short term, negated plaintiff's claims of irreparable harm.  On July 20, 2010, plaintiff filed a motion for judgment on the administrative record.  On August 16, 2010, defendant and defendant-intervenor filed cross-motions for judgment on the administrative record.  Following completion of the briefing, the court held oral argument on the motions on September 14, 2010.

## II.    DISCUSSION

Before turning, in detail, to plaintiff's claims, we begin with common ground.

### A.     Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact."  *Bannum* teaches that two principles commonly associated with summary judgment motions – that the

existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record.  *Id.* at 1356.  The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding.  *Id.*; *see also Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45-46 (2005).  Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1354; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).

*Bannum*'s approach is well-suited to the limited nature of the review conducted in bid protests.  In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A) (2006); *see also* 28 U.S.C. § 1491(b)(4).  By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003).  As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency.  Failing to do so, the Federal Circuit recently observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009).  At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).  Indeed, a "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).[3]

---

[3]  As noted by the Federal Circuit, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing *Burroughs Corp. v. United States*, 223 Ct. Cl. 53, 617 F.2d 590, 597-98 (Ct. Cl. 1980)); *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005), *aff'd*, 163 Fed. App'x. 892 (Fed. Cir. 2006).

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp.*, 365 F.3d at 1351, *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs. v. United States*, 77 Fed. Cl. 196, 201 (2007).   Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).   To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'"   *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).[4] "Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear."   *NEQ*, 88 Fed. Cl. at 47; *see also Banknote Corp.*, 56 Fed. Cl. at 380-81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

## B.   Plaintiff's Assignments of Error

Plaintiff's assertions of error run the gamut, implicating virtually every aspect of the analysis leading up to the Army's award decision.   Some of its claims focus on the Army's price analysis; others on the Army's technical evaluation; and still others on the Army's evaluation of past performance, responsibility and the potential existence of organizational conflicts of interest. The court will consider these claims *seriatim*.

---

[4]   Federal Circuit cases indicate that this prejudice analysis comes in two varieties.   The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief.   A second prejudice analysis is more in the nature of a standing inquiry.   In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 109 n.5 (2003). Cases construing this second variation on the prejudice inquiry have held that it requires merely a "viable allegation of agency wrong doing," with "'viability' here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true." *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 718-19 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006).   This "viability" standard is reminiscent of the "plausibility" standard enunciated in several recent Supreme Court cases.   *See Dobyns v. United States*, 91 Fed. Cl. 412, 422-26 (2010) (discussing the "plausibility standard" of pleading drawn from *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).   At all events, because of the nature of the allegations of error here, the court is convinced that plaintiff has met this preliminary "standing" threshold.

1.      Price

As its initial salvo, plaintiff asserts that the Army failed to evaluate Spectrum's price proposal in accordance with the requirements of the RFP.  This argument has two major prongs.

a.      **Failure to Comply with Professional Services Clause**

Plaintiff argues that the Army failed to evaluate Spectrum's professional employee compensation plan in accordance with the requirements of the professional services clause found at FAR § 52.222-46, which was incorporated by reference into the RFP.  The latter clause "is required to be inserted in RFPs for contracts expected to exceed $500,000 when the service to be provided 'will require meaningful numbers of professional employees.'"  *Statistica*, 102 F.3d at 1579 (quoting 48 C.F.R. § 22.1103); *see also K-Mar Indus. Inc. v. United States*, 91 Fed. Cl. 20, 23 (2010).  Plaintiff contends that had the Army performed the required evaluation, it would have discovered serious problems with Spectrum's compensation plan.

The subject clause states that "lowering the compensation (salaries and fringe benefits) paid or furnished professional employees" can be "detrimental in obtaining the quality of professional services needed for adequate contract performance."  48 C.F.R. § 52.222-46(a).  To avoid this detriment, the clause requires offerors to "submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract."  *Id*.  This paragraph further indicates that "[t]he Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements."  *Id*.  It goes on to provide that "[t]his evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work" as well as the plan's "impact upon recruiting and retention, its realism, and its consistency with the total plan for compensation."  *Id*. The clause states that "[s]upporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure."  *Id*.[5]  While noting that compensation levels in a proposal may be lower than those of predecessor contracts, the clause explains that such reductions "will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees."  *Id*. at § 52.222-46(b).  "[L]owered compensation for essentially the same professional work," the clause cautions, "may indicate lack of sound management judgment and lack of understanding of the requirement," *id*., adding that "[p]rofessional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the Contractor's

_____

[5]  FAR § 22.1103 states that the clause in FAR § 52.222-46 "requires that offerors submit for evaluation a total compensation plan setting forth proposed salaries and fringe benefits for professional employees working on the contract."  This provision states that "[p]lans indicating unrealistically low professional employees compensation may be assessed adversely as one of the factors considered in making an award."  FAR § 22.1103.

-11-

ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements," *id.* at § 52.222-46(c).

The purpose of the review envisioned by this clause is "to evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance, and to evaluate whether offerors understand the nature of the work to be performed." *Innovation Mgmt., Inc.*, 2003 C.P.D. ¶ 209 (2003); *see also ELS, Inc.*, 99-2 C.P.D. ¶ 92 (1999); *Research Mgmt. Corp.*, 90-1 C.P.D. ¶ 352 (1990). In this regard, the clause is designed to afford professional services employees protections mirroring those afforded other workers under the McNamara-O'Hara Service Contract Act of 1965 (SCA), Pub. L. 89-286, 41 U.S.C. § 351, *et seq.*[6] The primary purpose of the SCA is to protect "wage standards of employees" by preventing "federal purchasing power [from] playing a role in suppressing wage rates," with particular emphasis given to the impact of that power in rebiddings and successor contracts. *Ft. Hood Barbers Ass'n v. Herman*, 137 F.3d 302, 309 (5th Cir. 1998) (citing H.R. Rep. 89-948, at 2-3 (1965); S. Rep. No. 89-798, at 3-4 (1965)); *see also Gray v. Int'l Bhd. of Elec. Workers*, 868 F.2d 671, 677 (4th Cir. 1989).

Plaintiff asserts that the "plain language" of this clause "required the Army to compare the offerors' proposed compensation levels to those paid under the predecessor contract."

---

[6] The clause has its roots in Policy Letter 78-2, 43 Fed. Reg. 18805 (1978), entitled "Preventing Wage Busting for Professionals," which was issued by the Office of Federal Procurement Policy (OFPP) on March 29, 1978. *See* Louis D. Victorino & William A. Molinski, "Competing for Professional Services Contracts," 94-10 Briefing Paper 1 (1994) (hereinafter "Victorino & Molinski"). That letter expressed OFPP's desire to extend the policies of the SCA to professional employees. *See* 43 Fed. Reg. at 18806. Toward that end, the letter declares it be the policy of the government "that all service employees, including professional employees, employed by contractors providing services to the U.S. Government, be fairly and properly compensated." 43 Fed. Reg. at 18806. Recognizing "a predictable and essential link between personnel compensation and work performance," the letter indicates that the "evaluation of bids and proposals for service contract work shall take into account the realism of the offeror's proposed personnel compensation plan to assure that the offeror has a proper understanding of the resources required to perform high quality work on an uninterrupted basis." *Id.* In a segment entitled "Evaluation Factors and Criteria," the letter lists out three paragraphs containing the various requirements for evaluating compensation plans that are now found in paragraph (a) of the clause. *Id.* A succeeding paragraph provides as follows:

> Bids offering total compensation levels less than currently being paid by the predecessor contractor for the same work will be evaluated, in addition to the above, on the basis of maintaining program continuity and availability of required competent professional personnel.

*Id.*

Although not exactly plain, the clause's language certainly infers the need for such a comparison as it requires the agency to perform additional analysis when an offeror's compensation levels are lower than those paid by the incumbent.  Paragraph (b) of the clause thus indicates that "proposals envisioning compensation levels lower than those of predecessor contractors for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees."  48 C.F.R. § 52.222-46(b).  To be sure, these requirements overlap somewhat with those in paragraph (a).  The latter, after all, requires the agency to evaluate for every proposal (and not just those proposing lower professional compensation), an offeror's compensation plan to assure that it reflects "sound management" and an understanding of the contract requirements.  Both paragraphs, moreover, require the agency to assess the offeror's ability to provide "uninterrupted high-quality work," as well as the impact the proposed compensation will have on recruitment and retention.[7]

That said, the mere existence of paragraph (b) suggests that the drafters of the FAR intended agencies to perform more analysis when a recompetition of an existing contract occurs, with the obvious goal of promoting a smooth transition from one contract to the next.  In particular, unlike paragraph (a), paragraph (b) importantly requires the agency to consider the impact of lowering salaries on "maintaining program continuity."  Accordingly, on balance, it appears that an agency is obliged to make the threshold comparison described in paragraph (b), in order to determine whether it must conduct the further analysis of compensation plans required only for recompetitions.

This view finds support in *OMV Medical, Inc. v. United States*, 219 F.3d 1337 (Fed. Cir. 2000), where the Federal Circuit interpreted a predecessor version of the clause in question, *see* 48 C.F.R. § 52.222-46 (1998).  By way of prelude, in that case, this court had held that it was irrelevant whether the Air Force had rationally compared the offerors' salary levels with those of the incumbent as the agency had instead determined that the salaries in the compensation plans were not unduly low relying on the median salaries listed in the Bureau of Labor Statistics 1998-1999 Occupational Outlook Handbook (the Occupational Outlook Handbook).  *OMV*, 219 F.3d at 1343.  The Federal Circuit, however, reversed and remanded the case.  It held that the professional services clause required the agency to make two separate determinations:

> (1)  a determination of whether each offeror's compensation package was generally consistent with the salaries being paid by the incumbent contractor; and (2) a determination of whether each offeror's compensation plan was realistic, *i.e.*, whether it indicated that the offeror understood the scope of the work.

---

[7]  The court perceives little distinction between paragraph (a)'s requirements that the agency assess the impact of the compensation proposed upon "recruitment and retention," 48 C.F.R. § 52.222-46(a), and paragraph (b)'s requirement that the agency analyze the "availability of required competent professional service employees," *id*. at § 52.222-46(b).

*Id*. at 1343.  The first component of this analysis, the court stated, "was designed to ensure that the incoming contractor would not experience a large turnover in the program workforce because of a significant reduction in salary levels," while the second was "to determine the general level of compensation for equivalent positions."  *Id*.

The Federal Circuit held that the agency's findings under the second prong of the analysis, which relied upon the Occupational Outlook Handbook, were no substitute for the specific comparisons required by the first prong, reasoning:

> Because the [agency] designed the two components to serve different purposes and arranged for them to be calculated differently, the method the agency used to address one component is not interchangeable with the method used to address the other.  Thus, an offeror's salary levels could be consistent with the Occupational Outlook Handbook, indicating that the offeror had a reasonably clear idea of the level of compensation it would have to pay in order to obtain employees to perform the work of the contract, yet those salary levels might still be sufficiently far below the incumbent's salary levels that the incoming contractor would be likely to experience an unacceptably large staff turnover and loss of program continuity.

*Id*.  While recognizing that the agency need not make the required comparison "with impeccable rigor," *id*. at 1344, the Federal Circuit, nonetheless, remanded the case for a determination as to whether the analysis made by the Air Force in awarding the contract was rational.  *OMV* thus holds that, under the professional services clause, an agency must compare the incumbent's compensation to that proposed by the offerors as a prelude to determining whether further analysis of the offerors' compensation plan is required.[8]

---

[8]  Other cases have reached a similar conclusion, holding that contracting officials should, if necessary, obtain the incumbent's compensation figures needed to make the required comparisons.  *See CTA, Inc. v. United States*, 44 Fed. Cl. 684, 693-94 (1999); *see also* FAR §15.403-3 (noting that a price realism determination may require the contracting officer to obtain "information other than cost or pricing data").  This is how several commentators have construed this provision, with one set of commentators stating:

> Upon receipt of proposals, the source selection officials must review the compensation plans proposed to determine their adequacy.  The level of review given a plan will be determined by several factors including (a) how much the proposed rates deviate from the those of the incumbent or the Government's internal estimates of rates, and (b) the presence of language in the solicitation that elevates the importance of the compensation plan.  To the degree that proposed salaries and benefits are in line with incumbent salaries, a detailed, exhaustive review of compensation plans likely will not be required.  If the proposed rates are considerably lower than the incumbent's rates, however, the procurement officials will be required to make a thorough review.

A careful search of the contemporaneous administrative record reveals no indication whatsoever that anyone at the Army focused upon the requirements of this professional services clause during the evaluation process. Perhaps, the clause, which was only incorporated by reference in the RFP, was overlooked. Nevertheless, defendant argues that the Army backed into the required analysis while addressing other requirements in the solicitation. It attempts to baste together various snippets snatched from the evaluation papers and galvanize them into a set of findings that supposedly addresses the requirements of the professional services clause. In theory, defendant can attempt this multi-organ transplant because the failure strictly to comply with the clause provides a basis for setting aside the award here only if prejudicial – and the latter cannot be the case if the agency, in fact, performed the required analysis, even for other reasons. The result of this Promethean surgery need not be pretty. But, it must, in the end, yield (or constitute) the required analysis and findings – and here it does not.

Seeking to avoid this conclusion, defendant begins by quoting *OMV*'s admonition that the required comparison need not be made with "impeccable rigor." 219 F.3d at 1344. Defendant argues that the Army did all that was required when it compared the compensation figures in Spectrum's compensation plan to those proposed by plaintiff. But, this comparison is not the one envisioned by the FAR – the latter requires, instead, that the agency compare the offeror's compensation plan to the compensation actually being paid by the incumbent contractor. In some instances, distinguishing, for this purpose, between the incumbent's actual and offered compensation might prove important. For one thing, there is no assurance that the incumbent's compensation plan for the new contract, forged in the face of renewed competition, will provide for the same compensation it is paying on the old contract. But, this is not a problem here, as the compensation levels reflected in plaintiff's plan were the same as it was paying its employees under the bridge contracts. Accordingly, there can be no prejudice associated with defendant's failure to obtain and use the actual compensation being paid by CRA under the bridge contract, for it essentially had the same numbers.

So how were these comparisons made? The Army compared the labor rates for all the employment categories reflected in the offerors' compensation plans. To illustrate this, defendant points to a set of charts that were attached to the pricing reports. It also relies upon a slide used at the SSA briefing on August 27, 2009, prior to the second round of evaluations, which contains a chart comparing the offerors' labor rates for professional categories such as "family practice physician" and "orthopedic surgeon," as well as for nonprofessional categories such as "medical clerks" or "appointment clerks."[9] Commenting on this slide in his December

---

Victorino & Molinski, at 3; *see also* Ralph C. Nash & John Cibinic, "Uncompensated Overtime: White Collar Sweatshops?," 3 No. 3 Nash & Cibinic Rep. ¶ 21 (1989) (FAR § 52.222-46 "is primarily aimed at preventing a competitor from taking advantage of an incumbent contractor.").

[9] This slide (corrected here for an error noted in the record) made the following comparison:

24, 2009, source selection decision, the CO noted that some of these comparisons favored Spectrum, while others favored CRA.  In this decision, the CO ultimately found that "[o]verall there were no significant differences between the Spectrum and CRA proposals when taking into consideration bonuses, escalation, and fringe benefits."

The critical word in this sentence is "overall."  As plaintiff notes, rather than focusing upon the professional services categories, the CO apparently looked at the average results over all the labor categories and, in the process, failed to determine whether Spectrum's plan "envision[ed] compensation levels lower than those of the predecessor contractors for the same work," as required by paragraph (b) in the professional services clause.  The following chart, which uses the same data relied upon by the CO, but isolates and compares the labor rates for key professional employees in each party's compensation plan, illustrates what the CO's more generalized approach missed:

**Labor Rates in Contract Base Period**

| Labor category | Spectrum (North) | | Spectrum (South) | | CRA (North) | | CRA (South) | |
|---|---|---|---|---|---|---|---|---|
| | Rate | FTEs | Rate | FTEs | Rate | FTEs | Rate | FTEs |
| Chief Medical Officer | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Family Practice Physician | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Pediatrician | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Obstetrician | | | [ ] | [ ] | | | [ ] | [ ] |
| Internal Medicine | | | | | [ ] | [ ] | [ ] | [ ] |
| Nurse Practitioner (NP) - FP | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

---

| | **Spectrum** | **CRAssociates** |
|---|---|---|
| Family Practice Phys. | [ ] | [ ] |
| Pediatrician | [ ] | [ ] |
| Nurse Practitioner | [ ] | [ ] |
| Coordinated Care RN | [ ] | [ ] |
| LPN/CMA | [ ] | [ ] |
| Medical Clerk | [ ] | [ ] |
| Appt. Clerk | [ ] | [ ] |
| Ortho[paedic] Surgeon | [ ] | [ ] |
| Physical Therapist | [ ] | [ ] |
| Pharmacist | [ ] | [ ] |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NP - Ped | [ ] | [ ] | [ ] | [ ] | | | | |
| NP - OB | | | [ ] | [ ] | | | [ ] | [ ] |
| Optometrist | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Orthopedic Surgeon | | | **[ ]** | [ ] | | | [ ] | [ ] |
| Lead Physical Therapist | | | | | | | [ ] | [ ] |
| Physical Therapist | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Occupational Therapist | | | [ ] | [ ] | | | [ ] | [ ] |
| Lead Pharmacist | [ ] | [ ] | [ ] | [ ] | | | | |
| Pharmacist | **[ ]** | [ ] | **[ ]** | [ ] | [ ] | [ ] | [ ] | [ ] |
| Radiology Supervisor | [ ] | [ ] | [ ] | [ ] | [ ]* | [ ] | [ ]* | [ ] |
| Clinic Supervisor | [ ] | [ ] | [ ] | [ ] | [ ]* | [ ] | [ ]* | [ ] |

* CRA's Full Time Equivalent = 1840 hours annually

The bolded figures in the chart represent the higher of the matched labor rates, revealing that Spectrum's labor rates were lower than those being offered and paid by CRA in [] of the thirteen professional employment categories.  In addition, plaintiff points out – and defendant and defendant-intervenor do not disagree – that these salaries were expected to diverge even more over the life of the contract, as CRA offered [] than Spectrum.[10]  While defendant-intervenor maintains that, in some of these categories, its overall compensation, taking into account bonuses and retirement benefits, was higher than CRA's, even it admits that was not always the case.

---

[10]  More specifically, CRA offered [], while Spectrum offered [].  The following chart reveals the impact of this difference on the progression in family physician labor rates over the various stages of the contract:

| | Spectrum | CRA (North) | CRA (South) | % Difference |
|---|---|---|---|---|
| **Base Period** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |
| **Option 1** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |
| **Option 2** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |
| **Option 3** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |
| **Option 4** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |
| **Option 5** | [ ] | [ ] | [ ] | [ ] (North)<br>[ ] (South) |

Moreover, the latter claims serve to highlight further what the Army did not do – it did not actually calculate and compare the total compensation that CRA and Spectrum were offering to pay the professionals in question.

Had the Army done what it was supposed to do and focused on the professional services categories, it would have found that a significant number of professionals were going to be paid less by Spectrum than what comparable professionals had received working for CRA. And had it so found, the Army would have been obliged to conduct the recompetition analysis required by paragraph (b). *See Gen. Dynamics One Source, LLC*, 2010 C.P.D. ¶ 45 (2010) (agency realism analysis defective where agency failed to evaluate proper set of labor rates in evaluating awardee's compensation plan).[11] Defendant again contends that the Army, in fact, conducted this analysis, albeit while performing the analyses required by other clauses of the RFP. But, at this point, the bolts, sutures and other paraphernalia that defendant employs to truss together a proxy for the review required by the professional services clause begin to come apart.

Recall again that under paragraph (b) of the professional services clause the Army was obliged to evaluate the proposals "on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." FAR § 52.222-46(b). Defendant asserts that the Army did this in conducting the technical evaluation of the parties' compensation plans. But, the record demonstrates otherwise. For one thing, the SSEB, which was charged with evaluating the technical proposals, could not have considered the impact of Spectrum's lower compensation on its ability to maintain program continuity and uninterrupted work, as well as the availability of required competent professionals, as it was

---

[11] To be sure, under the FAR, that the newer compensation may be lower than the old constitutes a basis neither for downgrading the proposal of an offeror nor for determining whether a given compensation plan meets the requirements of the FAR. *See* 48 C.F.R. § 52.222-46(a) ("Recompetition of service contracts may in some cases result in lowering the compensation (salaries and fringe benefits) paid or furnished professional employees."). That is particularly so under the RFP in question, which includes, in its personnel segment, requirements that the offerors provide (and the Army evaluate) the offerors' recruitment and retention plans for "ensur[ing that] medical services commence on the date set forth in the solicitation and throughout the life of the contract." Certainly, the regulations in question do not prevent the government from obtaining a better price via such a lowering, provided there are no detrimental consequences associated with accepting such a price. *See* 48 C.F.R. § 22.1103 ("Plans indicating unrealistically low professional employee compensation may be assessed adversely as one of the factors considered in making an award."). Indeed, far be it from being disqualifying, the notion that competition might produce savings in terms of professional compensation is wholly in accord with the aims of the Competition in Contracting Act of 1984, Publ. L. No. 98-369, 98 Stat. 1175, the provisions of which "were designed not only to allow the Federal government to obtain the 'best products,' but to do so at the 'best prices.'" *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 491 (2008) (quoting H.R Rep. 98-1157, at 18 (1984)); *see also* S. Rep. 98-50, at 32 (1983).

walled off from any labor cost information and thus did not know how Spectrum's compensation compared to that offered by CRA.[12]   The RFP prohibited offerors from including any cost or price information in the technical portion of their compensation plan – the instructions for submitting technical proposals emphasized, in no uncertain terms, "DO NOT INCLUDE pricing information in the Technical Approach proposal" (emphasis in original) and indicated that, even under Subfactor 1C, dealing with compensation, the offerors were to describe the elements of their plan "excluding cost/price information."  In conformity with these instructions, the compensation plans supplied by the parties as part of their technical proposals spoke only in terms of generalities – indicating how, for example, their compensation compared to the national and capital region markets and the methods they would use to recruit and retain qualified personnel.

As the SSEB could not review what it did not have, it should come as little surprise that nothing in the technical evaluation worksheets or various composite reports focused on how Spectrum's proposed compensation would impact program continuity and the availability and retention of qualified professional employees, either at the outset of the contract or over time. Those comments regarding compensation, instead, focused only on benefits (*e.g.*, whether insurance or a uniform allowance was given) and how the offerors' overall compensation ranked, in percentile terms, in the market (*e.g.*,[] percentile).   And this general focus was maintained even though questions regarding Spectrum's compensation numbers were begged by:  (i) the fact that it intended to hire many of CRA's former employees; and (ii) a number of technical evaluators who expressed concerns that Spectrum's professional compensation, as compared to the NCA marketplace, might be too low.[13]   As such, these comments on the technical proposals

---

[12]   In their instructions, the SSEB members were told that "Factors 1 through 6 are the only factors which you will evaluate.  Evaluation of any other factors will render your evaluation invalid and will require the evaluation to be repeated."  At an earlier point, these instructions emphasized "[it] is important that you follow the instructions as set forth below to ensure the requirements for selecting the successful private sector offeror . . . are met."

[13]   On evaluator ascribed a technical weakness to Spectrum's proposal, commenting that –

[T]he offeror states for non-SCA covered positions [that Spectrum's] positions pay rates are at or above the [] percentile of market pay rates in the NCA marketplace for these positions:  Family Practice Physicians, Pediatricians, Internal Medicine Physicians, Obstetricians, Orthopedic Surgeons, and Optometrists.  This might not be sufficient for some of these providers.

Another evaluator noted that Spectrum had stated that it would "overcome recruit/retain challenges with pay and bene[fits], however, pay is at [], benefits are standard, nothing great  . . . ."   And a third evaluator made a similar statement and indicated, in proposing a discussion topic, that "[t]his is [a] concern due to past history, retaining these providers."  These same concerns were reflected in the consensus evaluation worksheet, which reacted to Spectrum's

did not address the issues raised by the compensation clause.  *Cf. OMV*, 219 F.3d at 1343 (holding that the agency's comparison of the offeror's compensation to Bureau of Labor statistics was "not interchangeable" with an analysis of the impact of lower compensation levels).  Nor is there any indication that the CO's initial price evaluation considered the impact of Spectrum's lower compensation in evaluating its proposal in terms of continuity of service, recruitment and retention, etc., as to professional employees – even though a slide from the June 29, 2009, SSA briefing cautioned that the CO felt that Spectrum's "[p]rice is too low."

This latter fact serves to emphasize that the only Army officials poised to conduct the analysis required by the professional services clause were the CO and the SSA.  Only they had access to both the technical and price proposals, as well as the corresponding evaluations, and thus could assess the impact of pay on recruitment and performance.  But, there is no indication that either of them conducted the required analysis.[14]  Indeed, the first (and only) mention of any evaluations relating to the professional services clause are in the CO's statement filed with the GAO, addressing the claims made by plaintiff in its protests.  In this statement, the CO admitted that he had not compared the offerors' compensation to the current salaries being offered, asserting that "this is not a requirement of the [clause]."  Rather, he indicated that –

> What I did include is a requirement in Paragraph 1c of Section L of the solicitation, an evaluation of the basis of all labor rates to include survey data and other sources of proposed salaries and wages.  This was evaluated by the SSEB and is found in the evaluation forms . . . .
>
> As for recruitment and retention, both salary data and fringe benefits were reviewed of both proposals.  Overall the fringe benefits offered by both offerors were similar.  One noted difference was that CRA was offering [], while Spectrum was offering [].  I concluded that CRA, as the incumbent, did not propose professional compensation lower than the current rates.  As Spectrums [sic]

---

claim that its wages would "result in appropriate levels of retention and initial recruitment" as "not realistic."  These concerns were flagged for discussions.  Views of the evaluators differed as to whether Spectrum adequately responded to this concern in its final offer.

[14] Perhaps recognizing the fallacy of its initial argument that the Army conducted the analysis required by FAR 52.222-46(b) in conducting the technical analysis of the compensation plan, defendant argued for the first time in its reply brief to its cross-motion that it was the technical analysis in combination with the price realism analysis that constituted a proxy for the analysis required by the professional service clause.  But, this claim is no more tenable than defendant's initial claim, as there is no indication that this issue was focused upon in the price realism analysis despite the concerns raised in the technical evaluation regarding Spectrum's compensation being too low.  That the CO declared Spectrum's price to be realistic for other reasons certainly is no substitute for the analysis required by the clause.

proposal was comparable to CRA's proposed rates, I concluded that Spectrum's rates were realistic.

The reference above to the SSEB, of course, is to the board's evaluation of the technical proposal, which, as already demonstrated, could not have addressed the inquiries required by the professional services clause.  The CO's further assertion that "CRA, as the incumbent, did not propose professional compensation lower than the current rates" is contradicted not only by the chart above, but also by the CO's admission earlier in his statement that he "did not obtain the current rates being paid by CRA" because he viewed the information as "proprietary" and because the clause did not require him to "compare [the compensation plan] to the current salaries being offered."  Moreover, on brief, defendant flatly admits that Spectrum's professional compensation was lower than that being offered by CRA.  Accordingly, while the CO contended to the GAO that he had complied with the clause, that assertion is demonstrably untrue.

Even if the CO's statement was not contradicted by the record, this court would be loath to afford it any weight in determining whether the agency complied with the FAR.  Other courts conducting APA reviews have limited their consideration of an agency's decision to the analysis and rationale appearing in the administrative record as of the time of the decision, holding that "[a]ny *post hoc* rationales an agency provides for its decision are not to be considered."  *Gen. Elec. Co. v. Dept. of Air Force*, 648 F. Supp. 2d 95, 100 (D.D.C. 2009) (citing *McDonnell Douglas Corp. v. U.S. Dept. of Air Force*, 373 F.3d 1182, 1187 (D.C. Cir. 2004)).  This approach serves to reenforce the agency's obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  And the agency must discharge this duty before, not after, it renders a decision.  *See*, *e.g.*, *210 Earll, L.L.C.*, 77 Fed. Cl. at 721 ("The APA requires a reasoned analysis at the time of the decision.").  Indeed, in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), the Supreme Court eschewed relying upon affidavits produced by the agency involved describing how the Secretary of the Interior had reached a particular decision, describing them as "'*post hoc*' rationalizations, . . . which have traditionally been found to be an inadequate basis for review."  *Id.* at 419 (citing *Burlington Truck Lines*, 371 U.S. at 168-69; *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653-54 (1990).[15]

---

[15]  There is a little tension between the notion that an agency cannot provide a new reason for a prior decision, but can provide further explanation for a decision already made.  *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ( "If . . . there was such failure to explain administrative action as to frustrate effective judicial review, the remedy [is] . . . to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."); *id.* at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").  The D.C. Circuit has resolved this tension by holding that "[t]he new

Now, there are differences between the affidavits rejected in *Overton Park* and the *post hoc* assurances made by the CO here – the former constituted a new rationale for an old decision; the latter a naked claim that the agency relied upon a rationale previously undisclosed.  But, the healthy dose of skepticism administered by Supreme Court in *Overton Park* still seems warranted here.  In both instances, the agency's post-decision conduct is expedient – confronted with an attack on its decision, the agency offers a new explanation, in one instance, and cites a previously undocumented rationale in the other.  Additionally, in both instances, allowing that explanation to act as a gap filler – to allow the agency to complete "an unfashioned creature[], but half made up"[16] – would frustrate effective judicial review under the APA standards.  After all, an essential premise of such review presupposes that the agency will establish its rationale at, or prior to, the time of its decision – not after.  Indeed, it should not be overlooked that the CO's statement in question was part of the agency's response to the protest and was intertwined with legal briefs filed by agency counsel defending the award.  *See* 31 U.S.C. § 3553(b)(2) (requiring the agency to make this filing).  In purpose and effect, then, there is little to distinguish that statement from arguments made by attorneys in briefs.  Yet, on the latter count, it is a well-accepted that such arguments are no substitute for the agency's contemporaneous articulation of the basis for its decision.  *See Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974) ("[W]e cannot 'accept appellate counsel's *post hoc* rationalizations for agency action;' for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" (quoting *Burlington Truck Lines*, 371 U.S. at 168; *Chenery*, 332 U.S. at 196)).[17]  And such also should be the case with the CO's statements here.

Why include such statements in the record at all?  The answer is found in 31 U.S.C. § 3556, which requires the court to treat the report containing that statement "as part of the agency record subject to review."  But, nothing in this statute, or any other authority, for that matter, requires the court to give the CO's statement any independent, let alone dispositive, weight.  That was the holding in *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 343

---

materials should be merely explanatory of the original record and should contain no new rationalizations."  *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006) ("We therefore hold that to the extent that an agency may supplement the record on judicial review of the validity of a rule that is interpretive, it may do so only if the proffered evidence illuminates the original record and does not advance new rationalizations for the agency's action."); *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) ("[T]he augmenting materials were merely explanatory of the original record.  No new rationalization of the . . . regulations was offered by the EPA.  Instead, the augmenting materials clarified a dispute that we felt was less than clear from the original record and were clearly admissible.").

[16]  Mary Shelley, Frankenstein 12 (1818).

[17]  *See also TNA Merchant Projects, Inc. v. FERC*, 616 F.3d 588, 593 (D.C. Cir. 2010); *In re Hounsfield*, 699 F.2d 1320, 1324 (Fed. Cir. 1983).

(1997), where, as here, defendant attempted to bootstrap its case by relying upon reports filed by agency contracting officials in a GAO protest.  Rebuffing that effort, this court explained –

> Attached to the second agency report are also the newly-created statements of [the] chairman of the Source Selection Advisory Council for this contract, and [the] chairman of the Source Selection Evaluation Board for this contract.  In the absence of a GAO record, these are the types of materials that the court would not receive or solicit, absent some need to supplement the agency record.  To the extent they purport to provide new evidence in support of the agency decision, they would normally come too late.  To the extent they point to the record at the agency, they are, in substance, argument.  They are useful, but innocuous, because they are only a guide to documentary justification already in existence.  By statute, however, the court is directed to treat all these materials as part of the record.  *See* 31 U.S.C. § 3556. The court has no choice but to do so.  It does, nevertheless, have a choice about the degree of relevance to assign to them.  As the court explained during oral argument, absent some other basis to consider these post-decisional materials, it will view them, not as evidence, but as argument.  Their only potential utility, other than as a key to the agency record, is to demonstrate what issues were raised or not raised at the GAO.

*Id.* at 343-44.  *Cubic* teaches that *post hoc* statements submitted to GAO, such as the CO's statement here, should have no office beyond summarizing what the administrative record already reveals.  And this court agrees.  Documents like these are not salvific – they can neither fill in gaps in the agency's reasoning for an award nor supply missing documentation of that reasoning.  *See Mike Hooks, Inc. v. United States*, 39 Fed. Cl. 147, 158 (1997) (documents submitted by procuring official during GAO protest treated not as evidence, but as argument).[18]

---

[18]  In the court's view, this conclusion is in line with the Federal Circuit's recent pronouncements regarding the proper scope of the administrative record.  *See, e.g.*, *Axiom Resource Mgmt., Inc.*, 564 F.3d at 1379-80; *see also Walls v. United States*, 582 F.3d 1358, 1367-68 (Fed. Cir. 2009) (emphasizing that these limitations are inherent in APA arbitrary and capricious review).  Relying upon these precedents, several decisions in this court have recently refused to include in the administrative record documents previously filed by private litigants in GAO protests.  *See Allied Tech. Group, Inc. v. United States*, 92 Fed. Cl. 226, 229-31 (2010) (rejecting materials filed in a prior protest before GAO); *cf. Academy Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 455 (2009).  These decisions stress, as did *Cubic,* the independent nature of the protest review in this court – that the review is neither of the GAO decision nor dependent thereupon – and conclude that the substantive content of the administrative record in this court ought not differ dramatically depending upon whether the case was preceded by a GAO protest.  While the exclusionary rule enunciated in these decisions cannot be extended to the CO statement in question, owing, *inter alia*, to the existence of a contrary statute, the considerations that underlie these cases buttress the conclusion that such statements ought be given little or no weight.

This is especially the case, of course, where the claims made in such statements are conclusory in nature and not only unsupported by the record, but contradicted thereby.[19]

To put it bluntly, in this proceeding, the CO's statement "ha[s] a ticket of admission, but to the very cheapest seats of probative value."[20]   Contrary to his claims, there is no indication the Army conducted the analysis required by FAR § 52.222-46 – it did so neither during the technical evaluation, nor during the price evaluation, nor in making the source selection decision. Cobbling these analyses together avails defendant naught – in government contracts, as in algebra, $0 + 0 + 0 \neq 1$.   The Army's failure to comply with the clause constituted a departure from the evaluation criteria specified in the solicitation and, correspondingly, a violation of both the FAR and the Competition in Contracting Act.   *See* 10 U.S.C. § 2305(a)(2)(A)-3(a); 48 C.F.R. §§ 15.303(b), 15.305(a); *see also Banknote Corp.*, 56 Fed. Cl. at 386 ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.").   Before considering the prejudice associated with these errors, the court will turn to plaintiff's remaining contentions.

### b.      Price Realism Analysis

In describing the process for evaluating offers, the RFP indicated that "[t]he price proposal will be reviewed for reasonableness and realism."   It added:

> Realism will pay particular attention to the facility costs, direct labor rates and fringe benefits.   Comparison to the IGE [independent government estimate] and analysis of the offeror's price proposal breakout and rational [sic] will be reviewed for excessive cost risk.

Those offers found to have such risk, this segment concluded, "will not be considered for award."   The parties essentially agree that the sum and substance of these instructions was that the Army was required to evaluate price realism by reviewing each separate CLIN for each FHC. But they disagree as to whether what the agency did was adequate.

A price realism analysis is designed "to ensure that an offeror understands the solicitation requirements and actually can perform those requirements prescribed in the [RFP] in the manner that it proposes."   *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007); *see also DMS*

---

[19]   Indeed, even the GAO, which takes a bit more liberal view of the weight that should be afforded to a CO's response to a protest, discounts such statements when they are conclusory and unsupported by the record.   *See U.S. Def. Sys., Inc.*, 92-1 C.P.D. ¶ 89 (1992) (conclusory statements in agency's post-protest explanation of its technical evaluation were inadequate).

[20]   The quoted language comes not from a Gothic novel, but from Edward Bennett Williams' oral argument before the D.C. Circuit in *Tavoulareas v. Piro*, Nos. 83-1604, 83-1605 (Feb. 10, 1984).

*All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 662-63 (2010).  Although plaintiff intimates otherwise, the FAR does not direct agencies to use any particular tools in conducting this analysis – indeed, the FAR is all but mum on this subject.  *Erinys*, 78 Fed. Cl. at 531; *Int'l Outsourcing*, 69 Fed. Cl. at 47 n.7.[21]  The absence of such guidance, of course, is strong indication that this matter is committed to agency discretion and, indeed, this court repeatedly has advised that "[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [this court] will not disturb such an analysis unless it lacks a reasonable basis."  *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10 (2000) (citation omitted); *see also DMS All-Star Joint Venture*, 90 Fed. Cl. at 663; *Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99, 106 (2001) ("[t]he nature and extent of an agency's price realism analysis are matters within the agency's discretion").  Nonetheless, this discretion "is bounded by the evaluation criteria stated in the solicitation" and any methodology to which the agency otherwise commits therein.  *DMS All-Start Joint Venture*, 90 Fed. Cl. at 663; *see also Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009).  In short, then, the court must determine whether the agency acted reasonably and in conformance with the RFP's requirements.

The Army conducted its price realism analysis using several analytical tools: (i) reconciling each offeror's technical approach with their pricing proposal; (ii) comparing each offeror's cost proposals against the independent government estimate (IGE); and (iii) reviewing various labor and compensation costs, as well as other direct and indirect costs.  These methods for verifying price realism have passed muster in a variety of cases.[22]

---

[21]  FAR § 15.404-1(d)(1) describes "cost realism analysis" as the –

process of independently reviewing and evaluating specific elements of each offeror's proposed cost to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

Various commentators have suggested that this FAR provision provides guidance in conducting a price realism analysis, at least where the offeror's proposed prices are unrealistically low.  *See* Ralph C. Nash & John Cibinic, "Price Realism Analysis: A Tricky Issue," 12 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1988); *see also DMS All-Star Joint Venture*, 90 Fed. Cl. at 663; Ralph C. Nash & John Cibinic, "Price Realism:  It's Different from Price Reasonableness," 17 No. 3 Nash & Cibinic Rep. ¶ 14 (March 2003).

[22]  *See Afghan Am. Army Servs.*, 90 Fed. Cl. at 358 ("When the agency provides for 'a price realism analysis in a solicitation for such purposes as measuring an offeror's understanding of the solicitation's requirements and for assessing the risk inherent in an offeror's proposal,' an appropriate . . . way[] to accomplish the testing include[s] 'comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the independent government estimate; and analysis of pricing information

Employing these methods, the CO made a variety of findings in his June 28, 2009, pricing review.  Initially, he examined the total difference between the two offerors' prices, which, at that time, was [] percent.  He then found that "when looking at individual line items there is an extreme difference in price," with differentials ranging as high as [] percent.  Such percentage differences necessitated a review of nine cost elements:  (i) build-out costs; (ii) staffing; (iii) direct labor rates; (iv) fringe benefits; (v) the accounting of subcontractors costs; (vi) indirect rates involving overhead and general and administrative overhead (G&A); (vii) profit; (viii) equipment maintenance; and (ix) facility maintenance.  As noted above, this review failed to focus on differences in the professional services direct labor rates offered by the parties and thus did not provide a realism analysis of those differences.[23]  On the other counts, however, the CO traced differences in the parties' pricing proposals back to observations made in the technical evaluations.  Relying on charts reflecting a variety of comparisons and reconciliations, the CO ultimately noted either that a given differential was not a basis for concern (*e.g.*, differences in the offerors' fringe benefits), reflected compliance with the solicitation (*e.g.*, equipment and facility maintenance), or warranted further discussions (*e.g.*, build-out costs that were too low or profit margins).  The CO proceeded to compare the offerors' prices with the IGE, finding that Spectrum's and CRA's offers were [] and [] the IGE, respectively.  Ultimately, as to this point, the CO determined that "[t]hese differences are consistent with the technical findings on their proposed staffing model," adding that "both proposals are expected to change as a result of discussions and . . . be within a tolerable range of the IGE . . . ."

On September 12, 2009, and September 19, 2009, following discussions and the receipt of best and final proposals, the CO, in two separate memoranda, respectively, revisited the issues that had earlier caused him concern.  He found, for example, that the total difference in price between the two offerors had shrunk to [] percent, and after examining the CLINs that had substantial price differentials, found that "the major differences can be found in their staffing."  The CO attributed the latter differences to such things as "differing distribution methods of staffing," including "[]."  He again compared certain direct labor rates for both offerors, as well as a reconciliation between the cost elements and the CLINS, and in neither instance identified any major issues.  Unconcerned that Spectrum's profit was only [], the CO noted that, when

---

provided by the offeror.'" (quoting *Matter of Burns & Roe Servs. Corp.*, 2005 C.P.D. ¶ 150 (2005)); *PharmChem, Inc.*, 2003 C.P.D. ¶ 148 (2003) (price realism analysis can be reasonably conducted by "evaluat[ing] each line item and the total price for each proposal and compar[ing] them with [the] independent estimate and with other offerors' prices").

[23]  In arguing otherwise, defendant suggests that because the CO found that Spectrum's overall price was realistic, he must necessarily have concluded that such was the case as to its compensation for professionals.  But, this is a *non sequitur*, as it is equally plausible that the CO found that the overall price was realistic without conducting the required analysis – and the latter finding, unlike the first, is borne out by the record.  As such, this is not a situation in which it is appropriate to interpolate findings reasonably to be inferred from other findings.

asked, the offeror confirmed that this figure was correct and that "their intent is to be competitive." And after comparing the offerors' new prices against the IGE, the CO found that Spectrum's and CRA's prices were [] and [] the IGE, respectively. The CO found that "[t]hese differences are consistent with the technical findings on their proposed staffing models" and that "[t]he total staffing from both proposals are considered adequate in the total number of personnel proposed."

Plaintiff does not so much challenge the Army's methods for assessing price realism, as it does the findings that sprang from those methods. It asserts that the agency's finding that Spectrum's price was realistic was arbitrary and capricious as based on "irrational assumptions or critical miscalculations." *OMV*, 219 F.3d at 1344. In fact, though, it appears that plaintiff merely disagrees with several of the CO's individual findings. For example, it asserts that had the Army performed the evaluation required by the RFP, it would have concluded that Spectrum's proposal presented risks because, *inter alia*, it proposed almost no profit. But, as described above, the CO focused squarely on this issue and obtained assurances from Spectrum that left him fully satisfied that the profit figure posed no unacceptable risk. While "the risk of poor performance when a contractor is forced to provide service at little or no profit is a legitimate concern in evaluating proposals," *Joint Venture of Penauille/BMAR & Assocs.*, 2008 C.P.D. ¶ 118 (2008), the presence of a low profit rate does not necessarily dictate that a price is unrealistic, especially in a fixed-price contract. *See Elec. Hardware Corp.*, 2006 C.P.D. ¶ 5 (2006); *MW-All Star Joint Venture*, 2004 C.P.D. ¶ 98 (2003).[24] Plaintiff has not shown that the approach taken by the Army in examining this profit issue was arbitrary and capricious. Its mere disagreements are not enough. *See Banknote Corp.*, 56 Fed. Cl. at 384 ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." (quotation and citation omitted)); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 660 (2002) ("[N]aked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that . . . findings were the product of an irrational process and hence arbitrary and capricious.").

Nor does the court entirely agree with plaintiff that the agency acted in an arbitrary and capricious fashion in failing to conduct a line-by-line realism review of the option years. There is little doubt that the Army was required to consider the option years in its overall realism analysis, for those years were included in the "price proposal breakout" which the RFP explicitly indicated would be analyzed. *See Gen. Dynamics One Source, LLC*, 2010 C.P.D. ¶ 45 (2010) (sustaining a protest on the basis of the agency's failure to analyze for price realism the option years of an

---

[24] *See also Triple H. Servs.*, 2006 C.P.D. ¶ 115 (2006) ("[I]t is well settled that a bidder may, in an exercise of its own business judgment, properly decide to submit a price that is extremely low, including below-cost prices . . . . Moreover, there is no prohibition against a procuring agency's acceptance of a below-cost bid for a fixed-price contract; . . . ."); *Acepex Mgmt. Corp.*, 98-2 C.P.D. ¶ 128 (1998) ("[a] fixed-price offer that is below cost is legally unobjectionable and cannot be rated lower or downgraded in the price evaluation for source selection by virtue of its lower price").

offer).  But, it reads too much into the RFP's language to suggest that the agency had to review the CLINs for the base and option periods in the same way.  Rather, it appears that the agency had the discretion to determine that its analysis of the base period was not substantially altered by the cost changes that were to occur in the option periods and thus to conclude, via that extrapolation, that the entire proposal reflected a realistic price.  That extrapolation, to be sure, broke down as to the professional service compensation, but only because the agency misanalyzed the base year.  Beyond this compensation issue, plaintiff has provided no evidence that the agency abused its discretion in failing to conduct a more detailed analysis of the CLINs in the option years.  *See Construcciones Aeronauticas, S.A.*, 91-2 C.P.D. ¶ 461 (1991) (sustaining a price realism analysis in which the agency studied the base year, but focused only on the comparative rates of changing costs in evaluating option years).

Accordingly, with the exception of the agency's handling of professional compensation, the court finds that the Army's price realism analysis was consistent with the evaluation criteria set forth in the RFP and not otherwise arbitrary and capricious.  *See Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375-76 (Fed. Cir. 2009).

## 2.    Technical Evaluation

CRA makes several distinct claims that the Army improperly evaluated the offerors' technical proposals.  First, it asserts that the Army departed from the evaluation criteria when, despite the prohibitions outlined above precluding offerors from including pricing information in their technical proposals, it permitted Spectrum to tout cost savings in its technical proposal.  Second, it argues that the Army's assigning of a "marginal" rating to CRA's staffing plan was arbitrary and capricious and the result of disparate treatment.  Finally, it contends that the Army's assignment of a weakness to CRA's facility location and layout again was arbitrary and capricious and the result of disparate treatment.  The court will consider these claims *seriatim*.

### a.    Inclusion of Pricing Information in Technical Proposal

Spectrum's technical proposal repeatedly touted that it was "poised to succeed in the performance of these contracts while evidencing a greater than [] cost savings to the Government over current clinic operations."[25]  Plaintiff asserts that the inclusion of this language violated the RFP's instruction that the technical proposals not include "pricing information."  Not so, claims

---

[25]  At another point in its technical proposal, Spectrum asserted that "[t]hrough our affiliation with our parent company and through the use of established nationwide programs that have proven effective, we are able to offer all of these cost containment programs as well as additional efficiencies at [] less than the present incumbent's contract."  Later, it reiterated that "[o]ur proposal is approximately [] cheaper than the incumbent's present cost while providing several value-added services."  In concluding its technical proposal, Spectrum reiterated that "we are poised to succeed in the performance of these contracts while evidencing a greater than 10% cost savings to the Government over current clinic operations."

defendant and defendant-intervenor, noting that plaintiff engaged in the same sort of "puffery" in its technical proposal.

Contrary to the parties' competing claims, it is far from clear what is meant by "pricing information." The term "pricing" is defined in the FAR as "the process of establishing a reasonable amount or amounts to be paid for supplies or services." FAR § 2.101. Likewise, FAR § 14.503-1(a)(5), which applies to two-step sealed bidding (this is not such a procurement), indicates that requests for technical proposals shall include "[a] statement that the technical proposals shall not include prices or pricing information." Both provisions suggest that "pricing information" conceptually is broader than "prices" and that a statement relating to pricing could be "pricing information" even if it does not list specific prices.

On the other hand, one must wonder whether a proposal's reference to costs or even "cost savings" should be viewed as a reference to "pricing information," particularly in a negotiated procurement that anticipates a largely fixed-price contract. Unlike in a cost-reimbursement situation, of course, in a fixed-price procurement, the offerors' prices bear no direct relationship to their respective costs, and can fluctuate up and down in comparison to those costs depending upon potentially differing profit and overhead factors. *See McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 295, 303 (1997); John Cibinic Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 1079, 1104-05 (1998). Perhaps for this reason, in such procurements, the FAR provides that "[c]ost information may be provided to members of the technical evaluation team in accordance with agency procedures." FAR § 15.305(a)(4).[26] Consistent with this view, the RFP here appears to treat cost and pricing information differently. For example, the description of the requirements for the compensation plan stated that the offerors were to exclude "cost/price information," with this alternative phrasing obviously suggesting that cost and price information were not the same thing. Other provisions in the RFP describing the content of the technical proposals, moreover, clearly envisioned that the offerors would comment therein about costs – urging comments about employee compensation, ways in which to "aggressively manage overall cost of health care for the enrolled population," and "energy savings." Indeed, as defendant and defendant-intervenor are quick to point out, CRA itself touted in its technical proposal a "[] reduction" in build-out costs and that expansion space was offered at "a [] rental [] of the current lease rate of the main building premises." All of this is evidence that the phrases "cost information" and "pricing information" are not synonymous.

As neither party offers a bright-line definition of "pricing information" for negotiated procurements, and none is apparent, the court will resist the temptation to supply one. *Cf. United States v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1332-33 (M.D. Fla. 2003) (defining the phrase "cost or pricing data" as used in the Truth in Negotiations Act, 10 U.S.C. § 2306a).

---

[26] Indeed, apart from the terms of the RFP, there is no legal restriction in this type of procurement that would prohibit the release of pricing information to any or all members of a technical evaluation panel. *See Scheduled Airlines Traffic Officers, Inc.*, 89-2 C.P.D. ¶ 57 (1989); *Joseph L. De Clerk & Assocs.*, 86-1 C.P.D. ¶ 146 (1986).

Suffice it to say that plaintiff has not shown that the Army abused its discretion in failing to conclude that the statements in Spectrum's technical proposal were "pricing information" within the meaning of the RFP.  Again, those statements only concerned costs – and they made comparisons only to the cost of performing the incumbent contract and not to the costs that CRA might incur in the future.  The statements could not be used by the technical evaluators to determine whether Spectrum's ultimate price would be higher or lower than that of CRA, especially given the prospect that each offeror would employ different profit and overhead factors (which, in fact, they did).  As such, the comments did not raise the specter that the prohibition in the RFP was obviously designed to address – that the technical evaluators might be biased in favor of a cheaper proposal.  *See ADT Const. Group, Inc.*, 06-1 B.C.A. ¶ 33,237 (2006) (purpose of this clause is "to avoid having the technical evaluators biased by this information").  At least in this sense, then, the statements in question were not "pricing information."

Even if this was not the case, there is no indication that the Army treated the offerors unequally on this count, failing to evaluate the proposals evenhandedly against common requirements.  *See Serco*, 81 Fed. Cl. at 482; *see also* FAR § 1.602-2(b) (requiring a contracting officer to "[e]nsure that contractors receive impartial, fair, and equitable treatment").  Rather, it would appear that under a broad definition of "pricing information" that sweeps in any reference to absolute or relative costs, both Spectrum's and plaintiff's technical proposals would violate the instructions in the RFP.  Finally, every indication is that any error committed by the agency in failing to reject these references was *de minimis* – one that had no significant effect upon the evaluation of the technical proposals and, as a result, could not have prejudiced plaintiff.  *See Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 331 (2009).  Again, plaintiff has not shown to the contrary, seemingly proceeding from the notion that prejudice on this point ought be presumed.  But, that is not the law.  *See Elec. Data Sys., L.L.C. v. United States*, 93 Fed. Cl. 416, 437 (2010) ("[i]t is no less an affront to that intent to 'deem' the prejudice requirement fulfilled, than it would be to dispense with that proviso entirely").[27]

### b.    Staffing Plan Factor

Plaintiff next asserts that the CO acted arbitrarily in assigning it a "marginal" rating for Factor 4, relating to its staffing plan.  It challenges the CO's assessment of a weakness/ disadvantage owing to a perceived discrepancy between the number of individuals working for CRA and the number of full-time equivalents reflected in CRA's proposals.  Plaintiff asserts that the same "discrepancy" – having more employees working than FTEs – could be found in Spectrum's proposal, yet did not result in Spectrum receiving a comparable weakness and "marginal" rating.

---

[27]  This is not to say that the court agrees with defendant and defendant-intervenor's claims that plaintiff must actually demonstrate that the inclusion of these statements impacted the award decision.  In the court's view, this goes too far the other direction.

Review of these assertions is hindered by the cryptic and incomplete state of the record on this point. As defendant notes, the CO wrote CRA on September 15, 2009, requesting that the latter address the fact that its "staffing charts have more medical assistants scheduled than they have total FTEs at Fairfax." On September 17, 2009, CRA responded, indicating that it had adjusted its staffing – decreasing the staffing at its Fairfax location, while increasing it at its Woodbridge location. Despite these changes, on September 28, 2009, the CO determined that plaintiff's staffing plan still warranted a "marginal" rating, stating that plaintiff had "adjusted [its] staffing ratios," but that its "scheduling charts still seem to have more staff scheduled that [sic] you have total FTEs." This same document assigned plaintiff's staffing plan a weakness/deficiency, stating, "[s]ample staff scheduling plan for Fairfax and Woodbridge reflects staffing numbers that exceed the numbers of FTEs proposed elsewhere." One searches in vain, however, for the staffing figures to which the CO was referring. Defendant supposes that this reference was yet again to the medical assistants scheduled at the various facilities. But, this claim is not borne out by the record as a review of CRA's September 17, 2009, letter reflects no discrepancy between the total number of FTEs dedicated to medical assistants and the scheduling charts. Both sets of figures, rather, reflect [] FTEs for medical assistants at Fairfax and [] FTEs for such assistants at Woodbridge.[28] Try as it might, defendant has been unable to identify any other "mismatched" FTE figures that correlate with the CO's findings.

It is axiomatic that, under the APA, an "agency must examine the relevant data and articulate a satisfactory explanation for its action . . . and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Chenery Corp.*, 318 U.S. at 94 ("[t]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained"). "While [the court] may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). That said, as the Supreme Court later instructed in *Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985), "[t]he task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." The Court added that where that record is incomplete, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744; *see also Riser v. United States*, 93 Fed. Cl. 212, 217 (2010); *Serco*, 81 Fed. Cl. at 480 n.22. Accordingly, if the record before the court precludes a determination as to whether "the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure," *Impresa Construzioni Geom. Domenico Garfafi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir.

---

[28] To be sure, CRA's staffing chart breaks out these figures as between "lead medical assistants" and "medical assistants." But, one simply needs to add those two figures together to yield the figures found in a later scheduling chart – for example, for Fairfax, the first staffing chart indicates [] FTEs of lead medical assistants and [] FTEs of medical assistants, while the second scheduling chart merely indicates [] FTEs for "MAs" or medical assistants.

2001), and the claimed error, alone or in combination, appears prejudicial, the court must remand the matter to the agency to allow it to supply, in the first instance, the missing explanation.

Applying these principles to the case *sub judice*, the court concludes that the Army's explanation of plaintiff's "marginal" rating for its staffing plan is insufficient to allow for appropriate judicial review.  Unlike defendant, the court will not guess what the agency had in mind, particularly, where review of the evaluation process reveals multiple errors in the agency's decisional path.

### c.       Facility Location and Layout Factor

In terms of the technical evaluation, plaintiff last challenges the evaluation of its facility locations and layouts, asserting again that it should not have received a "satisfactory" rating on this factor and that Spectrum received unequal treatment.  It notes that CRA and Spectrum both proposed excess space at the FHCs, yet only CRA received a weakness on this count.  The identification of that supposed weakness led CRA to receive a "satisfactory" rating on this factor, while Spectrum was assigned a rating of "good."

In its final proposal, CRA proposed [] square feet of space at its north site and [] square feet at its south site, for a total of [] square feet.  By comparison, Spectrum proposed [] square feet at its north site and [] feet at its south site, for a total of [] square feet.  Both CRA's and Spectrum's proposals exceeded the Army's estimate of space – by about [] and [] square feet, respectively.  Defendant and defendant-intervenor claim that CRA received a weakness for this, but not Spectrum, because only the latter unambiguously promised to cover all the costs associated with the excess space.  There are two problems with this defense.

First, the record indicates that CRA received a weakness on this factor, not because of any cost considerations, but because the evaluators were concerned that the excess space would be underutilized and put the agency at risk of being cited during audits for violating the "bona fide need" rule found in 31 U.S.C. § 1502(a).  The latter rule mandates that a fiscal year's appropriations only be obligated to meet a legitimate ("bona fide") need arising in the fiscal year for which the appropriation is made.[29]  Logic suggests that if this rule would be violated by the

_____

[29]  31 U.S.C. § 1502(a) states –

The balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability or to complete contracts properly made within that period of availability and obligated consistent with section 1501 of this title.  However, the appropriation or fund is not available for expenditure for a period beyond the period otherwise authorized by law.

*See* 33 Comp. Gen. 90, 92 (1953); Karen L. Manos, "The Antideficiency Act Without an M

agency's acceptance of the excess space in CRA's proposal, the same would be true if it accepted excess space from Spectrum.  This, perhaps, explains why defendant has chosen not to argue this point.  It claims instead that the assignment of a weakness was proper because only Spectrum, and not CRA, unambiguously agreed not to pass along the costs associated with its excess space to the Army.  And therein lies the second problem.  For one thing, defendant conveniently overlooks the fact that Spectrum made this pledge only because, during discussions, it was asked specifically "[i]s this vacant space being charged to the Government?"  CRA was not asked that same question.  Nonetheless, in its final proposal, CRA emphasized that its space plan was cost effective.  And, indeed it was – the record reflects that the overall cost of CRA's leased space was $ [], while that for Spectrum was $ [].  Accordingly, CRA's rating was downgraded for proposing excess space, even though its total lease costs were $ [] lower than those proposed by Spectrum.  If this is not unequal treatment, what is?

Now, of course, one could argue that the rating of the offerors' technical proposals ought not consider these differences in costs.  But, that argument goes both ways.  Seemingly, the agency cannot consider cost "avoidance" in giving Spectrum's proposal a leg up, while ignoring the same thing in assessing CRA's overall leasing costs.  Moreover, it appears that the technical evaluation team had access to this cost information – it is mentioned in the technical portions of the proposals and leasing costs are specifically discussed in the technical evaluation worksheets.  Even if the technical team did not have access to all this information, the CO and the SSA surely did.  They were the final arbiters of what weaknesses and ratings should be assigned – and, by regulation, they were to ensure that these evaluations were done consistently and that the source selection decision represented an independent judgment.  *See* FAR §§ 15.304(b)(3) (requiring consistency); 15.308 (requiring independence).  And, on this point (and others), they failed to discharge responsibilities even though the CO exercised the very same authority in altering several other adjectival ratings as part of the agency's corrective action.  The agency's failure to correct the anomalies created by the SSEB's evaluation in regards to the excess space caused CRA and Spectrum to be treated disparately, in plain violation of the FAR.  It would be absurd to conclude otherwise.

Accordingly, the court must sustain most of plaintiff's claims regarding the evaluation of the technical proposals.[30]

_____

Account:  Reasserting Constitutional Control," 23 Pub. Cont. L.J. 337, 349 (1994) (explaining this provision).

[30]  The court finds unpersuasive plaintiff's claim that the Army misevaluated the offerors' transition plans.  In plaintiff's case, the Army's rating is based upon a series of weaknesses only some of which plaintiff addresses.  Accordingly, there is no indication that the Army acted in an arbitrary and capricious fashion in assigning CRA a "satisfactory" on this factor.  Nor is there any indication that the Army should have given Spectrum less than a "satisfactory" rating on this factor – plaintiff relies upon isolated phrases taken from Spectrum's proposal in suggesting that the latter did not provide a complete and responsive transition plan.  As the agency found, a more complete reading of Spectrum's technical proposal reveals otherwise.

3.        **Past and Present Performance**

Plaintiff next challenges the agency's evaluation of Spectrum's past and present performance, contending that the Army failed to enforce the RFP's requirement that Spectrum provide past performance information for any subcontractors that were to "perform major or critical aspects of the work." Plaintiff asserts that the Army mistakenly took Spectrum's failure to submit past performance material as an indication that it and its subcontractors lacked relevant experience and erroneously assigned Spectrum an "unknown" rating for that criterion. This action, in plaintiff's view, was inconsistent with the RFP's evaluation criteria.

The RFP required offerors to submit past and present performance information as to "all relevant contracts and subcontracts started or completed within the past 3 years." Offerors were required to submit this information for any "subcontractors that will perform major or critical aspects of the work." For each such contract or subcontract, the offeror was to provide a variety of information, including a "Past Performance Information Collection Sheet." The RFP emphasized that "[a]lthough the Government may obtain past performance information from other sources, it is the offeror's responsibility to provide past performance information and explain how the information is relevant to this acquisition." The Army was to use this information to determine whether a given contract or subcontract was relevant and then to conduct interviews with the customers in those contracts deemed relevant. Based upon the information supplied by the offeror, the Army originally rated Spectrum's past performance as "adequate;" during one of the GAO protests, however, the Army took "corrective action" and changed Spectrum's rating from "adequate" to "unknown."[31] While characterized by the Army as a step designed to address CRA's concerns, this change potentially benefitted Spectrum because, under the RFP, an "unknown" rating was to be used only as a "tiebreaker." Since CRA received an "excellent" rating for its past performance, the effect of changing Spectrum's rating from "adequate" to "unknown" was to cancel out an advantage that CRA would otherwise have

---

[31] In explaining the basis for this change, the Army's corrective action memorandum stated:

> The basis for the revised rating was a further review of the five past performance data collection sheets submitted by Spectrum and a further review of the CPARS [Contractor Performance Assessment Reporting System] past performance database. It was determined that a significant weight was placed in the original rating based on past performance of Spectrum's parent company and sister company which was reflected in four of the five data collection sheets. Upon further review of the technical proposal, it was not clear of the role that these two companies would have in the performance of this contract. In reviewing the CPARs report, it was clear that Spectrum did have good past performance reported on the contracts; however, the scope of that past performance was found less relevant to the requirements of the solicitation and, therefore, their rating was lowered to Unknown.

enjoyed in the evaluation of the proposals.  *See Homesource Real Estate Asset Servs., Inc. v. United States*, 2010 WL 3448193, at *13 n.13 (Fed. Cl. Aug. 11, 2010) ("A score of Neutral is given so that an offeror without sufficient Past Performance will not be helped or hindered by the lack of Past Performance.").

Defendant does not deny that at least one of plaintiff's subcontractors, [], was to perform major or critical aspects of the work.  It asserts, however, that there was no indication that [] had started or completed any relevant contracts within the three years prior to Spectrum's submission.  But, Spectrum's own proposal belies this claim.  Thus, in touting its subcontractors' experience, Spectrum stated that [] was a joint venture of [] and [], and that it had "a firm contractual arrangement in place with [the joint venture] to provide a significant portion of our staffing needs."[32]  It indicated that [] "excels at providing medical staffing services to the Military Health System," noting further that "[] currently staffs over 210 healthcare professionals and medical support staff, including physicians and physician assistants."  Likewise it asserted that [] is "a leading organization in the provision of healthcare professional staffing to the U.S. military," and that it was "currently staffing over 1,900 HCPs and 54 Physicians at 70 MTFs [military treatment facilities]," and had received the "Joint Commission Healthcare Staffing Services Certification."

Despite Spectrum's vaunted claims about its subcontractor's relevant and "current[]" experience, the Army made no attempt to obtain past performance information regarding the contracts performed by the partners making up [].  Perhaps, defendant ultimately might have decided that the experience of these individual joint venture partners was irrelevant or even that the work of the [] partners was not reasonably predictive of the joint venture's performance.[33]  But, it could not relieve Spectrum of its responsibility to provide the basic information upon which such decisions would be based.

---

[32]  Accompanying charts indicated that [] was to provide the following:  [].

[33]  *See, e.g.*, *M-W All Star Joint Venture*, 2004 C.P.D. ¶ 98 (2004) (agency had discretion in determining whether joint venture's past experience should be rated based on experience of partners); *Strategic Res., Inc.*, 2001 C.P.D. ¶ 131 (2002) (same).  At the same time, FAR § 15.305(a)(2)(iii) states that the evaluation "should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition."  OFFP has issued guidance encouraging agencies to look to the past performance of key management personnel and subcontractors to "reduce [] the chance of needing to neither reward nor penalize an offeror with no other relevant past performance information" under FAR § 15.305(a)(2)(iv).  OFFP, Best Practices for Collecting and Using Current and Past Performance Information, Ch. 3 (Office of Fed. Procurement Policy, et al. 2000) (internal quotation marks omitted) (as quoted in *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010)).

The situation encountered is thus comparable to that faced in *Forest Regeneration Servs., LLC*, 2002 C.P.D. ¶ 187 (2002), where the GAO persuasively concluded –

> Although FAR § 15.305(a)(2)(iv) requires an agency to assign a neutral rating where past performance information is not "available," here, [the offeror's] proposal represented that it had 4 years experience performing like services and that its references were available upon request.  The information thus was available, but [the offeror] chose not to present the information in its proposal, in direct contravention of the RFP's instructions. . . .  An offeror cannot simply choose to withhold past performance information – and thereby obtain a neutral rating – where the solicitation expressly states that the information should be furnished, and where the information is readily available to the offeror.

*Id*. at n.5; *see also Menendez-Donnel & Assocs.*, 2001 C.P.D. ¶ 15 (2001) (neutral rating inappropriate where "information thus was available, but [the offeror] chose not to present the information in its proposal, in direct contravention of the terms of the RFP"); *SKE Int'l, Inc.*, 2008 C.P.D. ¶ 111 (2008) (questioning whether the unknown rating was appropriate where the agency had difficulty in evaluating an offeror's past performance questionnaires).[34]  Indeed, the statutory provision that obliges agencies to give an offeror an "unknown" rating does so on the premise that such an offeror is "without a record of relevant past performance or for whom information on past performance is not available."  41 U.S.C. § 405(j).[35]  Similar conditions on the use of an "unknown" rating are imposed by the FAR.  *See* FAR § 15.305(a)(2)(iv).  Neither of these conditions were met here, suggesting, at a minimum, that the Army acted in an arbitrary and capricious fashion and contrary to the RFP (and the underlying statutory and FAR provisions), when it gave Spectrum an "unknown" rating – essentially taking the offeror's past performance off the table (or at least reducing any advantage that CRA might otherwise have

---

[34]  *See generally, Apptis, Inc.*, 2008 C.P.D.  ¶ 49 (2007) ("[t]his provision does not apply where . . . an offeror is determined overall to have relevant past performance history"); *Chicataw Constr., Inc.*, 2002 C.P.D. ¶ 62 (2002) (same); *Wilson Beret Co.*, 2002 C.P.D. ¶ 206 (2002) (same).

[35]  The legislative history of this provision, passed as part of FASA, reflects Congress' intent to shift federal procurements away from items engineered and produced exclusively for the United States and towards items more commercially available.  *See* H. Conf. Rep. 7121, at 184 (1994); Felix Kushnir, "Evaluating Offerors Without Past Performance Information:  The Good, the Bad, and the Neutral," 35 Pub. Cont. L.J. 317, 323-324 (2006) (citing 39 Cong Rec. 14281 (1993) (statement of Sen. Glenn)).  Congress recognized that the latter items might be produced by new entrants into Federal government contracting and did not want their lack of experience to weigh against awards.  Nothing in this legislative history suggests that Congress intended agencies to ignore relevant past performance information.  To the contrary, in both the statute and its legislative history, Congress emphasized the importance that past performance information can have as a predictor of future success.

enjoyed in the evaluation of that past performance), rather than finding that Spectrum had failed to comply with a material requirement in the RFP.[36]

### 4.    Other Claimed Errors

Plaintiff makes two remaining claims of error, neither of which is persuasive.  First, it asserts that the Army erred in failing to conduct an entirely new investigation and analysis prior to determining on February 17, 2010, that Spectrum was responsible.[37]  Plaintiff asserts that this analysis violated FAR § 9.105-1(a), which states that "[b]efore making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards."  Plaintiff claims that the Army was required to use "current" information in making its responsibility determination, but did not do so because it relied upon materials submitted by Spectrum in its various proposals.

To be sure, the regulation undeniably requires an agency to rely on current information in making its responsibility determination.  In this regard, FAR § 9.105-1(b)(3) provides that "[i]nformation on financial resources and performance capability shall be obtained or updated on as current a basis as is feasible up to the date of award."  But, this language does not prohibit an agency, in exercising its judgment, from relying upon information that was accumulated prior to the award decision, particularly, if, in that same judgment, the agency determines that the prior information still reflects the awardee's ability to perform the contract.  Indeed, FAR § 9.105-1(b)(1) indicates that a contracting officer can obtain information regarding responsibility prior to the award decision – for some types of information, "promptly after bid opening or receipt of proposals," and, in other instances, even "before issuing the requests for proposals."

---

[36]  Plaintiff cites other subcontractors that it claims were to perform major or critical aspects of the work and for which Spectrum also did not provide past performance information. Principally, in this regard, it focuses on the subcontractors that were to build Spectrum's facilities.  It is unclear from the record whether the Army viewed or should have viewed these subcontractors as performing major or critical aspects of the work.

[37]  As to "responsibility," FAR § 9.103 provides that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."  *See also Ryan Co. v. United States*, 43 Fed. Cl. 646, 651 (1999).  This regulation mirrors a similar requirement found in FASA.  *See* 10 U.S.C. § 2305(b)(3); 41 U.S.C. § 253(b)(4); *see also John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1301 (Fed. Cir. 1999).  A contracting officer's responsibility determination focuses on the offeror's ability to satisfy its contractual commitments encompassed within its offer, requiring findings that the contractor has adequate financial resources; a satisfactory record of performance, integrity, and business ethics; and the necessary organization, skills, and production facilities.  FAR § 9.104-1; *see also Ryan*, 43 Fed. Cl. at 651.

Thus, it is hardly the case that an agency's reliance upon information that has not been updated to the time of a new responsibility decision is a *per se* violation of FAR § 9.105.  Indeed, the Federal Circuit essentially rejected this argument in *John C. Grimberg Co.*, 185 F.3d at 1303, in which it held that a contracting officer had not violated these responsibility provisions in failing to request new information from an offeror found to be nonresponsible.  Finding that the regulations afforded the contracting officer considerable discretion in deciding whether to seek supplementation of information regarding an offeror, the Federal Circuit reasoned –

> Although FAR 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs.  *See id.*  Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.  *See Trilon Educational Corp. v. United States*, 217 Ct. Cl. 266, 578 F.2d 1356, 1358 (1978); *Keco Indus.*, 492 F.2d at 1205.  Thus, although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so.

*Id*. at 1303; *see also Tip Top Constr., Inc. v. United States*, 563 F.3d 1338, 1345 (Fed. Cir. 2009); *Impresa*, 238 F.3d at 1334-35; *Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002).  This reasoning resonates here, even though the question presented is whether the agency was required to obtain more information before making the determination that Spectrum was responsible.  Indeed, one can make a strong argument that the agency's discretion in this case is even broader than that described in these other cases, given that the Army here agreed, as part of corrective action, only to review certain aspects of a responsibility determination that it had made but a few months earlier.  Certainly nothing in *John C. Grimberg Co.*, let alone FAR § 9.105, suggests that the agency cannot agree to provide such limited forms of reconsideration, focused upon the correction of alleged specific errors in a prior responsibility determination.  As such, the court finds no error here.

Likewise off the mark is plaintiff's assertion that the Army violated FAR § 9.504 when it failed to identify and evaluate potential organizational conflicts of interest (OCI) in its evaluation of Spectrum's proposal.  Plaintiff asserts that Spectrum had such a conflict because: (i) the Army had reason to know that Spectrum had a contract with Health Net to provide staffing for the TRICARE Virginia region; and (ii) under the RFP, the contractor is involved in deciding whether to refer patients to other providers, including Health Net, the TRICARE contractor for the NCA.  But, these twin premises prove faulty.  First, the record contradicts plaintiff's claim that Spectrum currently provides services to Health Net in the NCA or TRICARE North regions.  Overall, the record suggests that Spectrum only currently provides such services to Health Net for services to veterans in Nevada and New York.  Second, plaintiff virtually ignores the fact that under the contract envisioned: (i) MTFs, and not the TRICARE contractor, were the first option for patient referrals; and (ii) referral decisions were to be reviewed by a Referral Management Office, run by the Army, with the authority to overrule any decision made by the contractor and send a patient to whatever facility that office believed appropriate.  Accordingly, even if Health

Net obtained a presence in the NCA, there is no indication that Spectrum could exploit referrals for Health Net's gain.

The FAR indicates that in determining "whether a significant potential conflict exists," the agency should examine "[e]ach individual contracting situation" on the basis of "its particular facts and the nature of the proposed contract," adding that "[t]he exercise of common sense, good judgment, and sound discretion is required." FAR § 9.505. Here, the court cannot say that the Army acted in an arbitrary and capricious fashion in failing either to identify the alleged OCI or developing a plan to resolve it. This claim thus must fail.

### C. Prejudice

"Not every error by a [contracting officer] justifies overturning an award." *United Int'l Investigative Servs., Inc. v. United States*, 42 Fed. Cl. 73, 87 (1998), *aff'd*, 194 F.3d 1335 (Fed. Cir. 1999). Rather, when a challenge is brought on the ground that a procurement involved a violation of a regulation or procedure, "'the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'" *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa Construzioni*, 238 F.3d at 1333); *see also Axiom Res.*, 564 F.3d at 1381; *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). As noted above, to demonstrate prejudice, a "protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statistica*, 102 F.3d at 1582); *see also Bannum*, 404 F.3d at 1358; *Galen Med. Assocs.*, 369 F.3d at 1330-31; *Int'l Outsourcing Servs.*, 69 Fed. Cl. at 47. "This test is more lenient than showing actual causation," the Federal Circuit has instructed, because the protestor need not "show[ ] that but for the errors [it] would have won the contract." *Bannum*, 404 F.3d at 1358; *see also Alfa Laval Separation*, 175 F.3d at 1367; *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

Given the range and depth of the errors found here, it requires little to conclude that plaintiff was prejudiced by the Army's conduct of this procurement – that but for those errors, "there was a substantial chance it would have received the contract award." *Alfa Laval Separation*, 175 F.3d at 1367; *see also USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010) ("multiple errors might cumulatively establish prejudice"). Indeed, the Army's failure to conduct the analysis required by FAR § 52.222-46, standing alone, likely would be sufficient to demonstrate prejudice. That error impacted not only the agency's price evaluation, but also the CO's and SSA's final consideration of the weaknesses and ratings that should have been associated with the technical evaluation of the offeror's compensation plans. In addition, the agency committed several errors in its technical evaluation which led the offerors to be treated unequally, resulting in differences in adjectival ratings that, at this point, cannot be supported by the record. The Army's mishandling of the past performance evaluation again gave Spectrum an unwarranted ratings advantage there. The correction of these errors undoubtedly could lead to significant fluctuations in both technical ratings and price, paving the way for plaintiff to receive an award of the contract. This leaves the court with the firm conviction that the combined impact of the errors encountered here clearly prejudiced plaintiff.

-39-

### D.      Injunctive Relief

Having concluded that the instant procurement was legally flawed and that plaintiff was thereby prejudiced, the court must determine whether plaintiff has made three additional showings to warrant injunctive relief, *to wit*, that: (i) it will suffer immediate and irreparable injury; (ii) the public interest would be better served by the relief requested; and (iii) the balance of hardships on all the parties favors it.  *Serco Inc.*, 81 Fed. Cl. at 501; *Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 137 (2006); *Bannum*, 60 Fed. Cl. at 730; *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Serco, Inc.*, 81 Fed. Cl. at 501; *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  In the case *sub judice*, the existence of irreparable injury to plaintiff, the balancing of harms in favor of plaintiff, and the public interest all lead this court to grant injunctive relief to plaintiff.

### 1.      Irreparable Injury

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743 (2000) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)).  Plaintiff argues that it will suffer irreparable harm if an injunction is not granted, because the only other available relief – the potential for recovery of bid preparation costs – would not compensate it for the loss of valuable business on this contract.  This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.  *See Serco, Inc.*, 81 Fed. Cl. at 501-02; *Impresa Construzioni*, 52 Fed. Cl. at 828; *United Int'l Investigative Servs.*, 41 Fed. Cl. at 323 ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Magnavox Elec. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992) (same); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").[38]  Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### 2.      Balance of Hardships

Under this factor, "the court must consider whether the balance of hardships leans in plaintiff's favor," requiring "a consideration of the harm to the government and to the intervening defendant."  *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006); *see also*

---

[38]  Support also exists for the proposition that the denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm.  *See Serco*, 81 Fed. Cl. at 502 n.61 (citing cases); *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 398-99 (1999) (citing cases); *but see Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 381-82 (1997) (noting "economic harm without more, does not seem to rise to the level of irreparable injury").

*Serco*, 81 Fed. Cl. at 502; *Heritage of America, L.L.C. v. United States*, 77 Fed. Cl. 66, 78-79 (2007); *PGBA L.L.C. v. United States*, 57 Fed. Cl. 655, 663 (2003). Defendant and defendant-intervenor argue that the court should not delay implementation of a contract designed to improve the delivery of improved health care services. But, this court has observed that "'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *PGBA*, 57 Fed. Cl. at 663 (quoting *Ellsworth Assocs.*, 45 Fed. Cl. at 399); *see also Reilly's Wholesale*, 73 Fed. Cl. at 716. This is not such an "exceptional case," for a variety of reasons.

First, defendant has not explained how setting aside the award would work any immediate hardship on military personnel and their dependents seeking medical care. To the contrary, it appears that the needs of these personnel and their dependents are adequately being met under the bridge contract, which, in fact, incorporates a number of the benefits anticipated under the new contract. And defendant has admitted that services can be rendered under the bridge contract, which has various options, until such time as a new award decision is made, even allowing time for a transition to the new contract. Second, the delay and administrative burdens associated with setting aside the current award and requiring the agency to take curative actions are, of course, problems of defendant's own making. Those ill effects, moreover, may be ameliorated by a properly-framed injunction that, as defendant has urged, is narrowly tailored to the errors encountered. *See, e.g.*, *Reilly's Wholesale*, 73 Fed. Cl. at 716. It is the court's intention that the injunction entered below be construed in this fashion – indeed, this is why the court has reviewed, in painstaking detail, virtually all of plaintiff's claims of error,[39] even though a subset of those errors, found to be well-taken, might have resulted in the award decision being set aside. In these circumstances, the balance of hardships tilts in the plaintiff's favor.

### 3.   Public Interest

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief. The court agrees. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA*, 57 Fed. Cl. at 663; *see also Serco, Inc.*, 81 Fed. Cl. at 502; *Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp.*, 27 Fed. Cl. at 448. In the present case, the public's interest likewise lies in preserving the integrity of the competitive process, particularly in the context of a large procurement that will intimately impact the lives of military personnel and their families for an extended period of time. It is vitally important not only to these service members and their dependents, but to the public at large, that the Army, after correcting the errors identified above, makes an award decision that truly represents the "best value" for all concerned.

---

[39] The court has not considered plaintiff's claims regarding the Army's "best value" determination as the court's adoption of many of plaintiff's other arguments essentially renders those claims moot.

**III.     CONCLUSION**

Based on the foregoing:

1.      Plaintiff's motion for judgment on the administrative record is **GRANTED**, in part, and **DENIED**, in part, and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are **DENIED**, in part, and **GRANTED**, in part.

2.      Defendant, acting by and through the Department of the Army, is hereby **ENJOINED** from performing or allowing others to perform on the contract awarded pursuant to (RFP) No. W81K04-09-R-0002.  Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under the contract.

3.      It is the court's intent to unseal and publish this opinion after **October 19, 2010**. On or before **October 18, 2010**, each party shall file proposed redactions to this opinion, with specific reasons therefor.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

-42-